# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

THADDEUS KWASNIK,

     Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

     Defendant.

Civil Action No. 3:21-cv-08573

**OPINION**

**WOLFSON, Chief Judge:**

Thaddeus Kwasnik ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant"), denying Plaintiff's application for disability benefits under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record ("A.R."), the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence, and accordingly, the ALJ's decision is **AFFIRMED**.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, born on June 9, 1958, was 55 years old on his alleged disability date of July 4, 2013. (A.R. 63.) Plaintiff's date last insured ("DLI") was December 31, 2018. (*Id.*) On January 11, 2018, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability due to spinal stenosis, knee and right shoulder problems, bone spurs, cardiovascular disease, Barrett's Syndrome, anxiety, depression, sleep apnea, and narcolepsy. (A.R. 17, 64.) The claim was denied initially on May 17, 2018, and upon reconsideration on July 30, 2018. (A.R. 17.) Plaintiff then filed a written request for a hearing, which was held on October 17, 2019. (*Id.*) On December 11, 2019, the ALJ determined that Plaintiff was not disabled under

the relevant statutes.  (A.R. 31.)  Following the ALJ's decision, Plaintiff requested that the Appeals Council review the decision.  (A.R. 1.)  On February 11, 2021, the Appeals Council denied review, finding no basis under Social Security rules to review the ALJ's decision.  (A.R. 1.)  This appeal ensued.

## II.    Review of Medical Evidence

### i.    Medical Records

#### 1. *Wellness Visits*

In April 2017, Plaintiff visited Marla Osborn, D.O., for a general wellness visit.  (A.R. 352.)  At the visit, Plaintiff reported working on his horse farm every day, but that he did not go to the gym.  (A.R. 346.)  Plaintiff stated that for his spinal stenosis, he received injections, used a lidocaine patch, and was prescribed various medication.  (*Id*.)  Plaintiff also noted using Adderall in the morning to wake himself up and Vyvanse throughout the day.  (*Id*.)  Plaintiff was noted as positive for hearing loss, anxiety, and back pain.  (A.R. 348.)  Dr. Osborn assessed Plaintiff as having chronic bilateral low back pain with sciatica and sciatica laterality unspecified, but stated that Plaintiff reported 0/10 pain and noted to Plaintiff regarding his mental health, "You are doing great."  (A.R. 348-49.)

In April 2018, Plaintiff visited Michaela Lei, D.O., for a preventative exam.  (A.R. 658.)  Plaintiff reported that he felt a lot more functional since a prior doctor put him on Prednisone, and that he was seeing another doctor for pain management, which included 300mg of Tramadol daily.  (*Id*.)  Plaintiff stated he presently worked as a lawyer in family and real estate law.  (*Id*.)  Plaintiff noted that he still has anxiety, but his depression had improved.  (*Id*.)  Plaintiff explained that he was trying to be physically active, and swims in his pool.  (*Id*.)  Plaintiff, once again, stated he has a horse farm.  (*Id*.)  Dr. Lei concluded that Plaintiff's exam was within normal limits.  (A.R. 661.)

2

In July 2019, Plaintiff again visited Dr. Lei for a checkup.  (A.R. 1191.)  Dr. Lei noted that Plaintiff had shoulder surgery and will have right knee surgery due to arthritis.  (A.R. 1191.) Plaintiff reported that he has no depression.  (*Id*.)  Plaintiff also noted that he is a hay farmer.  (*Id*.) Dr. Lei stated Plaintiff's physical exam was within normal limits, and recommended that he continue swimming and walking.  (A.R. 1194.)

2. *Hearing*

Plaintiff had an audiological evaluation with Donna Szabo, Au.D., in June 2013.   (A.R. 319.)  Plaintiff reported wearing a Lyric hearing aid for one year, but that his provider no longer used Lyric.  (*Id*.)  Ms. Szabo stated that Plaintiff's pure tone thresholds indicated mild-to-moderately severe sensorineural hearing loss.  (*Id*.)  But, Ms. Szabo found that Plaintiff's speech discrimination scores were 88% in his right ear and 96% in his left year, which she stated indicates good to excellent ability.  (*Id*.)

In September 2013, Plaintiff visited James Lee, M.D., complaining of ear fullness.  (A.R. 314.)  Dr. Lee determined that Plaintiff's right ear canal was noninflamed and had impacted cerumen adherent to the tympanic membrane and ear canal, which Dr. Lee removed and debrided under magnification with a curette and suction.  (*Id*.)  Dr. Lee advised Plaintiff to avoid Q-tips, and encouraged him to follow up if symptoms worsen, change, or improve.  (*Id*.)

In August 2017, Plaintiff was referred to Dr. Albert Shrive, Au.D., for hearing tests.  (A.R. 758.)  The results of the pure tone air and bone conduction, speech discrimination, and most comfortable and uncomfortable loudness tests indicated a mild-to-moderately severe hearing loss in the left and right ears.  (*Id*.)  Based on these findings, Dr. Shrive recommended that Plaintiff be fitted with a custom, digitally programmable hearing aid.  (*Id*.)

3

3. *Cervical Degenerative Disc Disease and Bilateral Shoulder Impairments*

In June, July, and August 2016, Peter Nyitray, M.D. gave Plaintiff cervical epidural steroid injections for cervical radicular pain.  (A.R. 555, 557, 574.)  In November 2016, Plaintiff reported his neck and right shoulder pain is severe, but had improved, and that his back pain was a 7 and was persistent and worsening.  (A.R. 445.)  Dr. Nyitray administered another cervical epidural steroid injection in February 2017.  (A.R. 441.)

In April 2017, Plaintiff complained to Dr. Nyitray of moderate neck and bilateral arm pain, specifically aching, burning, tingling, and numbness, that occurred consistently and was worsening.  (A.R. 456.)  Plaintiff stated that he was doing home exercises without help and was taking Gabapentin, which was less effective for his radicular symptoms.  (A.R. 458.)  On examination, Plaintiff had a spasm along his cervical spine musculature and decreased sensation to pinprick and light touch.  (*Id*.)  However, Plaintiff's epidural injection reduced his pain by 50%, but his pain went back to baseline after a month.  (*Id*.)

In May 2017, Plaintiff visited Dr. Nyitray and reported pain in his right shoulder, neck, and knees, but stated that the pain was improving.  (A.R. 463.)  Plaintiff noted that while certain activities aggravated the pain, he knew how to adjust his medications based on his level of pain to provide relief.  (*Id*.)  Plaintiff had a paravertebral muscle spasm, walked with an antalgic gait, and had mildly reduced motion.  (A.R. 466.)  Dr. Nyitray assessed that Plaintiff's pain was well controlled on the current medication regimen.  (A.R. 466-67.)  In September 2017, Plaintiff's pain in his knees, back, shoulders, neck, and sciatica were reported as moderate.  (A.R. 474.)

In January 2018, Plaintiff visited Robert More, M.D., for acromioclavicular joint degeneration and inflammation in his right shoulder.  (A.R. 517.)  Plaintiff stated his pain was an 8 and was worsening, although his pain management regimen was helpful, which included

Gabapentin, Norco, Xanaflex, Tamadol, and Robaxon.  (*Id*.)  Dr. More diagnosed Plaintiff with primary osteoarthritis in his right shoulder, and more specifically, stated that Plaintiff appeared to have degenerative joint disease of the shoulder joint.  (A.R. 521.)

In March 2018, Plaintiff visited Pavlinka Dundeva-Baleva, M.D., at Ewing Rheumatology with complaints of chronic pain for the prior five years.  (A.R. 648.)  Plaintiff stated that physical therapy and epidurals helped his pain.  (*Id*.)  X-rays of Plaintiff's cervical spine that month showed asymmetric discogenic change at C5-C6 and C6-C7 with anterior marginal spurring and moderate-to-severe right and left C5-C6 and C6-C7 neural foraminal stenosis.  (A.R. 631.)  X-rays of Plaintiff's right shoulder found marked degenerative change and spurring of the acromioclavicular and glenohumoral joints.  (A.R. 638.)

In January 2019, Plaintiff visited Michael Pollack, MD, complaining of pain in both shoulders.  (A.R. 967.)  Plaintiff stated that he dropped a cup of coffee in his right hand the day before.  (*Id*.)  Plaintiff explained that he dislocated his left shoulder in November 2018 when he was taking care of horses and fell, causing him to hit his shoulder.  (*Id*.)  Plaintiff stated that since that incident, he had been using his right shoulder more.  (*Id*.)  Plaintiff noted that his pain was a 5/10.  (A.R. 971.)  Dr. Pollack administered injections to both shoulders and ordered an MRI on his left shoulder.  (A.R. 970.)  Plaintiff's MRI in February 2019 revealed a rotator cuff tear involving the entirety of the supraspinatus and infraspinatus tendons.  (A.R. 840.)

In March 2019, Plaintiff saw William Bentley, D.O., due to his history of neck pain, back pain, and sciatica, all of which he stated were improved with injections by Dr. Nyitray.  (A.R. 878.)  Plaintiff stated his pain was an 8/10.  (A.R. 879.)  Dr. Bentley recommended that Plaintiff continue with his course of medications.  (*Id*.)

On March 29, 2019, Plaintiff underwent left rotator cuff surgery.  (A.R. 26.)  Following surgery, Plaintiff visited Dr. Pollack for a post-operative appointment.  (A.R. 938.)  Plaintiff reported that he was steadily improving and did not have his usual complaints.  (*Id*.)  Plaintiff stated that certain activities were still causing problems, but he denied changes in sensation or strength.  (*Id*.)  Plaintiff also reported that he does aerobic exercise and uses weights two to three times a week.  (A.R. 940.)  Dr. Pollack administered an injection in Plaintiff's right shoulder. (A.R. 941.)

In June 2019, Plaintiff saw Dr. Bentley, reporting moderate pain (4/10) symptoms all over the body rating.  (A.R. 868.)  His symptoms include aching, burning, stabbing, throbbing, sharpness, and shooting.  (*Id*.)  But Plaintiff also noted that pain medication and rest helped relieve his symptoms, and that the symptoms are stable.  (*Id*.)  Plaintiff explained that he was a former lawyer, now a "gentleman farmer."  (A.R. 871.)  In that connection, Plaintiff stated that he had recently spent a couple of hard days collecting, drying, and bailing hay.  (*Id*.)  Regarding his symptoms, Plaintiff reported that the increased activity caused increased pain in his neck, which radiated to his shoulders.  (*Id*.)  Plaintiff explained that conservative therapy, including rest, ice, heat, and over-the-counter medications, among others, had failed, but that he had excellent success with cervical epidural steroid injections in the past.  (A.R. 871-72.)  Plaintiff also stated that pain medication provided significant pain relief and allowed for increased functionality.  (A.R. 872.) Following this conversation, Dr. Bentley scheduled a cervical epidural steroid injection.  (*Id*.)

In July 2019, in a visit with Dr. Pollack, Plaintiff was instructed on range of motion exercises, including the use of pulleys.  (A.R. 935.)  Plaintiff also was instructed in rotator cuff and parascapular strengthening exercises with use of exercise bands.  (*Id*.)  On examination,

Plaintiff's range of motion was an active elevation of 70 degrees, external rotation of 30 degrees, and total arc of rotation at 90 degrees.  (*Id*.)

### ii.    Medical Opinions

On April 17, 2018, Plaintiff underwent a psychological consultative examination with Jacqueline Farnese, Psy.D.  (A.R. 649.)  Plaintiff stated that he is an attorney, and that from 1990 to 2013, which was his date of last employment, he worked at the New York City Housing Authority.  (*Id*.)  Prior to that, he worked as an attorney for the state of New York and in the New York City District Attorney's office.   (*Id*.)   Plaintiff reported depression when not on antidepressants.  (*Id*.)  When he is depressed, his motivation lowers, and he isolates, cries, and feels hopeless, helpless, worthless, and angry.  (*Id*.)  He also struggles to multitask and cannot think sharply or clearly.  (*Id*.)  But Plaintiff denied suicidal or homicidal ideations, hallucinations, and paranoia.  (*Id*.)

On examination, Dr. Farnese noted that Plaintiff was well groomed, responsive, made eye contact, but had a narcissistic quality to him.  (A.R. 651.)  Plaintiff talked nonstop and seemed to be focused and concentrate on what he wanted to tell the doctor, but did not seem focused on the questions he was being asked.  (*Id*.)  Plaintiff was oriented to person, place, and date, knew who the president was, knew who the first president was, was able to recall 3/3 words immediately and 2/3 words after several minutes.  (*Id*.)  Plaintiff had difficulty with serial 7s, although he was able to get 6/6 correct by counting out loud and using his fingers, and was able to identify objects, follow directions, and spell "world" forward and backward.  (*Id*.)

Dr. Farnese's diagnosed Plaintiff with a depressive disorder, cyclothymia, and ADHD, because Plaintiff's current doctor diagnosed him as such.  (A.R. 651-52.)  Dr. Farnese also ruled out narcissistic personality disorder, although there were features of narcissism.  (A.R. 652.)

Plaintiff's level of function was determined to be fair and that he could handle his own money. (*Id*.)

On April 25, 2018, Leena Patel, M.S., CCC-A, performed an audiological examination. (A.R. 671.)  Plaintiff reported that he had first noticed hearing difficulties in 2008, and has worn hearing aids for the past ten years.  (*Id*.)  Plaintiff stated that he experiences aural fullness in both ears and has vertigo from sinus issues.  (*Id*.)  Plaintiff also reported a family history of hearing loss, noise exposure from his work at a maintenance company, and recreational noise exposure from shooting and the racetrack.  (*Id*.)  Dr. Patel's evaluation found that, in his right ear, he had normal hearing sensitivity from 250 Hz to 1000 Hz, followed by mild sensorineural hearing loss at 1500 Hz.  (A.R. 672.)  In his left ear, Plaintiff had normal hearing sensitivity from 250 to 2000Hz, followed by moderate to moderately severe sensorineural hearing loss from 3000 Hz to 8000 Hz.  (*Id*.)  Plaintiff's word recognition scores for words presented in quiet at an elevated conversational level were 76% in the right ear, which was rated as "fair," and 88% in the left ear, which was rated "good."  (*Id*.)  Dr. Patel stated that for speech to be comfortably loud, it needed to be presented at 80 dB HL in his right ear and 70 dB HL in his left year, and normal conversation levels were 50 dB.  (*Id*.)  In light of these findings, Dr. Patel opined that Plaintiff would have difficulty understanding speech, particularly unvoiced consonants, which she stated were critical for understanding speech.  (*Id*.)  Dr. Patel further explained that difficulty understanding speech will be greater with background noise, when the speaker is at a distance, or when the conversation is not face-to-face.  (*Id*.)

On May 16, 2018, a group of state agency medical consultants reviewed different portions Plaintiff's medical record at the initial level and found Plaintiff to be not disabled.  (A.R. 82.)  In so doing, Adalisse Borges, Ph.D., determined that Plaintiff had mild limitations in understanding,

remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself.  (A.R. 75.)  Dr. Borges concluded that Plaintiff's mental conditions were non-severe.  (A.R. 75-76.)  As to Plaintiff's exertional limitations, state consultant James Bilenker determined that Plaintiff could occasionally lift or carry 20 pounds, occasionally lift or carry 10 pounds, stand or walk for 2 hours, and sit for 6 hours in an 8-hour workday.  (A.R. 77.)  Furthermore, Mr. Bilenker opined that Plaintiff had no manipulative, visual, or communicative limitations, but did have certain environmental limitations, including that he would need to avoid exposure to extreme heat or cold, wetness, humidity, and other hazards.  (A.R. 79.)  Mr. Bilenker also determined that Plaintiff's could occasionally climb ramps or stairs, balance, and stoop, and never climb ladders, kneel, crouch, or crawl.  (A.R. 78.) State agency consultant Stephan Obornik found that Plaintiff had past work as a managerial attorney, and that Plaintiff had the RFC to perform this past work as generally performed in the national economy.  (A.R. 81.)  For these reasons, Plaintiff was found not disabled.  (A.R. 82.)

On reconsideration, July 26, 2018, state agency medical consultants affirmed these findings and also found Plaintiff to not be disabled.  (A.R. 85-104.)

In October 2018, Maybelline Pineda-Johnson performed a medical evaluation of Plaintiff's record.  (A.R. 759.)  She determined that Plaintiff was capable of light work activities and that Plaintiff's psychological conditions were non-severe.  (*Id*.)  Ms. Pineda-Johnson also opined that Plaintiff is able to perform his past work as a managerial attorney.  (*Id*.)

In November 2018, Ryan Mendoza, Ph.D., performed a review of the psychological record and concluded that Plaintiff had mild limitations in understanding, remembering, or applying information, interacting with others, and concentrating, persisting, or maintaining pace.  (A.R. 773.)  Dr. Mendoza also found that Plaintiff had no limitations in adapting or managing oneself.

(*Id.*)   Dr. Mendoza determined that the medical evidence established the presence of neurocognitive, depression, and anxiety disorders, but the record was not persuasive in showing that Plaintiff was more than mildly limited in functioning in light of his functional daily living activities, stable mental status examinations, and lack of psychiatric hospitalizations.  (A.R. 775.) For these reasons, Dr. Mendoza stated that Plaintiff's mental condition did not appear to add significant limits in functioning, and therefore his mental impairments were non-severe.  (*Id.*)

## B.  Review of the Testimonial Evidence

### i.  Plaintiff's Testimony

Plaintiff testified that he lives in a house with his 29-year-old son.  (A.R. 46.)   Plaintiff retired at age 55 in 2013, and started receiving a pension from New York City.  (*Id.*)  Plaintiff stated that he has a driver's license and a car, but that he does not drive the car out of fear after a 2010 car accident where he fell asleep behind the wheel.  (A.R. 47-48.)

Regarding his education, Plaintiff testified that he has an undergraduate degree in political science and a law degree.  (A.R. 48-49.)  Plaintiff stated that he was currently barred in New Jersey and New York, and that he maintains his CLE credits, although it's more and more difficult for him to fulfill the requirements due to inability to sit for long periods.  (A.R. 49.)   As to his work history, Plaintiff explained that he became special counsel at the New York Housing Authority in 2004.  (A.R. 50.)  In that role, Plaintiff managed a staff of over 18 attorneys and around 30 clerical or support staff, and at times, would argue cases in court.  (*Id.*)

When asked what would keep him from doing that job today, Plaintiff responded the travel, as it was over a two-hour drive each way.  (A.R. 51.)  The ALJ asked if anything kept him from working any job closer to home, Plaintiff replied that the job would have to be less than a few minutes from home to drive, otherwise he might fall asleep behind the wheel.  (A.R. 52.)  Outside

of travel, Plaintiff stated he has ADD and he believes it affects his work performance.  (*Id.*)

Plaintiff explained that it would be difficult to do routine tasks because he is easily distracted.

(A.R. 53-54.)  Plaintiff also complained that he has issues bending to pick things and he feels pain

in his entire body due to polymyalgia rheumatica when he attempts to do so.  (A.R. 55.)  He also

has issues standing for more than five minutes because of bone-on-bone issues with his knees, and

he has shoulder pain.  (A.R. 56.)  Plaintiff claimed that his orthopedist told him he cannot carry or

lift anything more than 5 pounds.  (*Id.*)  Furthermore, Plaintiff stated that he has problems sitting

for too long because of his spinal stenosis and sciatica.  (A.R. 57.)

As to his psychiatric history, Plaintiff stated he has seen a psychiatrist for anxiety and

depression since 2010, but that he has not seen a therapist since 2013.  (A.R. 58-59.)

### ii.  Vocational Expert Testimony

The Vocational Expert, Anetris Robertson ("VE"), began by classifying Plaintiff's past

work as an attorney, which has a DOT code of 110.107-010, and is a skilled profession performed

at a sedentary exertion level with an SVP of 8.  (A.R. 58.)  The ALJ then proceeded to ask the

following hypothetical:

> I'd like you to assume an individual the claimant's age and education, with past
> jobs you've just described.  Further, I'd like you to assume this individual is limited
> as follows.  Can lift and carry no more than 10 pounds.  Can stand and walk no
> more than two of eight hours, and sit for six of eight hours.  Only occasional pushing
> or pulling with the right arm, and no pushing or pulling with bilateral [lower
> extremities], like foot pedals.  Only occasional ramps and stairs.  No ladders, ropes,
> or scaffolds.  Occasional balancing and stooping.  No kneeling, crouching, or
> crawling.  Should avoid and have less than occasional exposure to extreme cold,
> heat, wetness, humidity, and no unprotected heights or hazardous machinery.
> Cannot work in high ambient noise areas.  But can otherwise communicate and
> respond to alarms and announcements.  Could that hypothetical individual perform
> any of the past jobs?

(A.R. 59-60.)  The VE replied, "[Y]es, Your Honor, the past work can be performed."  (A.R. 61.)

The ALJ then asked if the hypothetical person would be able to perform their past work if that

person were limited to simple instructions and simple decisions in a routine environment.  (*Id.*) The VE replied that that person could not perform their past work.  (*Id.*)

### C.  ALJ Decision

On December 11, 2019, the ALJ issued a written decision analyzing whether Plaintiff satisfied his burden to demonstrate disability using the standard five-step process.  (A.R. 17-31.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from his alleged onset date of July 4, 2013, through his date last insured, December 31, 2018.  (A.R. 19.)  At step two, the ALJ found that Plaintiff had the following severe impairments: hearing loss, degenerative disc disease of the cervical and lumbar spine, osteoarthritis of the bilateral knees, rheumatoid arthritis, and status post rotator cuff repair of the left shoulder.  (*Id.*)  The ALJ also considered Plaintiff's prior treatments for obstructive sleep apnea, hyperlipidemia, hypertension, coronary artery disease, and Barrett's esophagus/gastroesophageal reflux disease, but stated that these conditions were being managed medically and were amenable to proper control.  (A.R. 21.) Furthermore, the ALJ considered Plaintiff's anxiety, depression, ADD, and neurocognitive disorder, but determined that, singly and in combination, these impairments did not cause more than minimal limitation in Plaintiff's ability to perform basic work, and thus were non-severe." (*Id.*)  At step three, the ALJ determined that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" in the relevant CFR.  (A.R. 21.)  In so deciding, the ALJ considered listings 1.02, 1.04, and 2.10.  (A.R. 21.)

The ALJ then found that Plaintiff, through the date last insured, had the residual functional capacity ("RFC") to perform sedentary work, except that Plaintiff can:

> frequently lift/carry 10 pounds; stand and/or walk 2 hours in an 8 hour workday; and sit 6 hours in an 8 hour workday. The claimant can occasionally push/pull with

the right upper extremity, and never push/pull with the bilateral lower extremities. The claimant can occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds; occasionally balance and stoop; and never kneel, crouch, or crawl. The claimant should avoid and have less than occasional exposure to extreme cold, heat, wetness, and humidity, and have no exposure to unprotected heights or hazardous machinery. The claimant cannot work in high ambient noise areas but can otherwise communicate and respond to alarms and announcements.

(A.R. 21-22.)  At step four, the ALJ determined that through the date last insured, Plaintiff was capable of performing his past relevant work as a managerial attorney.  (A.R. 30.)  As such, the ALJ found that Plaintiff was not disabled.  (A.R. 30.)

## II.    <u>STANDARD OF REVIEW</u>

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); see *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations and citations omitted).  A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v.*

*Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993).  Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence.  *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. See 42 U.S.C. § 423(c).  Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." *Id.* § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427.  An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* § 1382c(a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled.  See 20 C.F.R. § 404.1520.  First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* § 404.1520(a)(4)(i); see *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See id.* § 404.1520(b); *see also Bowen*, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. *Id.*

14

§ 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5.  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." *Id.* § 404.1522(b).  These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* § 404.1522(b)(1).  A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). *Id.* § 404.1520(a)(4)(iii).  If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5.  If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See id.* § 404.1526(a).  If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.*  An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.  If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.

If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42.  The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at

428.  Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience.  20 C.F.R. § 404.1520(a)(4)(v).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant can perform work and not disabled.  *Id.*

### III.  PLAINTIFF'S CLAIMS ON APPEAL

First, as a threshold matter, Plaintiff argues that, in light of *Siela Law LLC v. Consumer Financial Protection Bureau*, 140 S.Ct. 2183 (2020), the former Social Security Administration ("SSA") Commissioner was appointed subject to an unconstitutional removal provision, and thus any decision by the ALJ, who, by statute, derives her authority from that Commissioner, is also unconstitutional.   Second, Plaintiff argues that remand is required because the ALJ failed to account for Plaintiff's credibly determined mental limitations, audiological limitations, and cervical degenerative disc disease in formulating Plaintiff's RFC.   Third, Plaintiff contends that the ALJ did not adequately develop the record pertaining to his shoulder injuries that occurred after he filed for disability.

### A.  Even if the Former SSA Commissioner was Subject to an Unconstitutional Removal Provision, the ALJ's Decision is Not Void

Plaintiff asserts that the ALJ's decision is void because the statute under which Andrew Saul, the former Commissioner of the SSA, was appointed contained an unconstitutional removal provision.  Plaintiff reasons that, in light of *Seila Law LLC v. CFPB*, it is, as a matter of separation of powers, unconstitutional for an executive agency led by a single commissioner to only be

16

removable for good cause.   As such, Plaintiff argues that 42 U.S.C. § 902(a)(3),[1] the statute pursuant to which Saul was appointed, is unconstitutional, and in turn, the power derived by the ALJ from Saul was invalid.   Pl. Br. at 25.   Notably, Defendant agrees that the statute is unconstitutional insofar as 42 U.S.C. § 902(a)(3) "violates the separation of powers [and] to the extent it is construed as limiting the President's authority to remove the Commissioner without cause."  Def. Br. at 16 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)). However, Defendant also, correctly, argues that the unconstitutional removal provisions in 42 U.S.C. § 902(a)(3) does not invalidate the ALJ's decision.

A year after *Seila Law*, the Supreme Court decided *Collins v. Yellen*, 141 S. Ct. 1761 (2021), where the Court clarified *Seila Law* in terms of the potential remedy available to those suing to invalidate individual actions implemented by agency officers subject to unconstitutional removal provisions.   In *Collins*, the Court determined that the "for cause" removal requirement for the Federal Housing Finance Agency ("FHFA") Director was unconstitutional.   *Id.*  As a remedy for this constitutional violation, the plaintiffs asserted that *Seila Law*, among other cases, required any action implemented by a Director subject to unconstitutional removal provisions to be void *ab initio*.   *Id*. at 1787.   As such, the plaintiffs requested that an amendment to an agreement between the FHFA and Fannie Mae and Freddie Mac, which was implemented during the terms of

---

[1] "The Commissioner shall be appointed for a term of 6 years, except that the initial term of office for Commissioner shall terminate January 19, 2001. In any case in which a successor does not take office at the end of a Commissioner's term of office, such Commissioner may continue in office until the entry upon office of such a successor. A Commissioner appointed to a term of office after the commencement of such term may serve under such appointment only for the remainder of such term. An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office."

appointed and confirmed FHFA Director subject to the unconstitutional removal provision, be rendered invalidated. *Id*.

The Court rejected this reading of *Seila Law*, and noted that plaintiffs "read far too much" into that decision. *Id*. at 1788. The Court stated that "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the [amendment] as void." *Id*. at 1787. Despite that distinction, the Court explained that this "does not necessarily mean, however, that the [plaintiffs] have no entitlement to retrospective relief," and stated that "it is still possible for an unconstitutional provision to inflict compensable harm." *Id*. at 1788-89.

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id*. at 1789. Put more clearly by Justice Kagan, "plaintiffs alleging a removal violation are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head affected the complained-of decision." *Id*. at 1801 (Kagan, J., concurring).

Here, the unconstitutionality of 42 U.S.C. § 902(a)(3)'s removal restriction does not void the ALJ decision. As an initial matter, after receiving Defendant's briefing, and likely in response to Defendant's discussion on *Collins*, Plaintiff has abandoned his argument that the ALJ's decision caused the denial of benefits. Pl. Reply Br. 11 ("Plaintiff will not pursue the ALJ issue any further because the ALJ issued his decision while former President Trump was still in office."). As such, Plaintiff argues, instead, that he suffered two injuries related to the Appeals Council which have a sufficient nexus with the unconstitutional removal provision. First, he claims to have not received

a "constitutionally valid adjudication process from the SSA's Appeals Council." Pl. Reply Br. at 12. Second, he contends that he "did not receive the constitutionally valid determination by the Appeals Council."

Plaintiff's arguments have two flaws. First, the ALJ's decision, not the Appeals Council's decision to deny review, constituted the final decision by the Commissioner of Social Security, and therefore, Plaintiff cannot assert harm by the Appeals Council. Indeed, Plaintiff appealed the ALJ's decision, and as part of that appeal, also challenged the ALJ's authority to act under the Appointments Clause. (A.R. 2.) The Appeals Council denied review of that decision. In such situations, the Appeals Council exercises "certiorari-type jurisdiction . . . over decisions by administrative law judges." *Eads v. Secretary of Dep't of Health and Human Servs.*, 983 F.2d 815, 816 (7th Cir. 1993). Once "the Appeals Council denies the request for review, the ALJ's decision is the Commissioner's final decision." *Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). For this reason, the ALJ's decision to deny benefits, not the Appeals Council's decision to deny review, caused the only potential harm to Plaintiff. In fact, the judicial review provision of the Social Security Act only allows claimants to seek review in a district court upon "any final decision of the Commissioner of Social Security[.]" 42 U.S.C. § 405(g). For this reason, the Third Circuit has expressly stated that "[n]o statutory authority, (the source of the district court's review) authorizes [district courts] to review the Appeals Council decision to deny review." *Matthews*, 239 F.3d at 594. As such, this Court does not have the authority to examine the Appeals Council's denial of review.

Second, as a more general matter, any reliance on *Collins*'s remedial analysis is misplaced. In *Collins*, the plaintiffs requested that the Court invalidate a decision by FHFA Directors to implement a contract amendment. Thus, the *Collins* Court answered the question of what remedy

19

was available for an action by an *agency head* subject to an unconstitutional removal provision. This Court faces a different question.  In this case, Plaintiff requests that this Court invalidate decisions by *inferior officers*, *i.e.*, the ALJ or Appeals Council, appointed by an agency head.  The *Collins* Court, therefore, never considered whether the actions of inferior officers, properly appointed by agency heads subject to unconstitutional removal restrictions, could be invalidated. As such, whether *Collins'* remedial analysis is applicable here is not readily apparent as suggested by Plaintiff.

But, even if this Court were to apply *Collins*'s remedial analysis, Plaintiff fails to argue a valid nexus between the unconstitutional removal restriction and Plaintiff's injuries.

Plaintiff's focus on the Appeals Council's decision, rather than ALJ's, has to do with timing.  In a clever attempt to comply with the *Collins* Court's examples of what might constitute compensable harm, Plaintiff speculates that President Biden "would have fired [Commissioner Saul] absent the unconstitutional statutory removal provision in this case."  Pl. Reply Br. at 13. Plaintiff bases this claim on the fact that shortly after *Collins* was decided on June 23, 2021, President Biden, on July 9, 2021, fired Commissioner Saul, claiming that "[s]ince taking office, Commissioner Saul has undermined and politicized" the SSA.  Lisa Rein, *Biden fires head of Social Security Administration, a Trump holdover who drew the ire of Democrats*, WASHINGTON POST (July 11, 2021), https://www.washingtonpost.com/politics/andrew-saul-social-security-/2021/07/09/c18a34fa-df99-11eb-a501-0e69b5d012e5_story.html.  To Plaintiff, the swift action by President Biden after *Collins* is indicative that, had he been able to, President Biden would have immediately fired Commissioner Saul upon entering office on January 20, 2021.  This is notable because Plaintiff's Appeals Council's decision was rendered on February 11, 2021.

20

I find this connection to be insufficient to invalidate the ALJ's decision.   Although President Biden stated on July 9, 2021, that he was unhappy with Commissioner Saul's performance, Plaintiff points to no statements *prior* to the Appeals Council's findings on February 11, 2021, that President Biden expressed any intent to relieve Commissioner Saul of his post.   *See High v. Kijakazi*, No. 20-3528, 2022 WL 394750, at *6 (E.D. Pa. Feb. 9, 2022) ("Thus, the agency action Plaintiff complains about – the ALJ's decision – took place before any President expressed concern about former Commissioner Saul. Hence, *Collins* teaches that Plaintiff cannot obtain relief.").   Both examples cited in *Collins* involve explicit statements, expressed either publicly or in court, that the hypothetical President would likely remove the agency head at issue, but cannot due to statutory restrictions.   *Collins*, 141 S. Ct. at 1789.   Without such a properly timed statement from President Biden, the Court would be engaging in mere guesswork as to President Biden's frame of mind between January 20, 2021, and February 11, 2021.   The Court cannot speculate as to what President Biden *may* have done upon taking office to remove Commissioner Saul.

As such, Plaintiff has failed to show a sufficient nexus between the unconstitutional removal restriction and the ALJ's decision.   *See Andino v. Kijakazi*, No. 21-2852, 2022 WL 1135010, at *6 (E.D. Pa. April 18, 2022) ("[I]t is not difficult to see that *Collins* requires Andino to demonstrate a nexus between the decision denying her disability benefits and 42 U.S.C. § 902(a)(3). She has not done this."); *Mor v. Kijakazi*, No. 21-1730, 2022 WL 73510, at *5 (D.N.J. Jan. 7, 2022) ("Plaintiff fails to point to any connection between the Commissioner's removal under Section 902(a)(3) and the ALJ's decision (or any other action in this case). As a result, the requisite nexus is not met, and the Court denies Plaintiff's appeal on this ground."); *see also Ford v. Kijakazi*, No. 21-1432, 2022 WL 1203731, at *6 (E.D. Pa. April 22, 2022) (denying separation

of powers claim because plaintiff failed to show "harm caused by Saul exercising authority he retained by virtue of the unconstitutional removal clause.").

**B.  The ALJ's RFC Decision Was Based on Substantial Evidence**

"[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see* 20 C.F.R. § 404.1545(a).  When a case is brought to an administrative hearing, the ALJ is charged with ultimately determining the claimant's RFC.  20 C.F.R. §§ 404.1527(e), 404.1546(c), 416.927(e), 416.946(c).  "[I]n making a residual functional capacity determination, the ALJ must consider all evidence before him[,]" and, "[a]lthough the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121; *see Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  When assessing a claimant's RFC, an ALJ must consider all of the claimant's medically determinable impairments which are supported by the record, including those considered non-severe.  20 C.F.R. §§ 404.1545 (a)(2), 416.945 (a)(2); *see also Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).  "Where the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3rd Cir. 2012) (internal quotation marks and citation omitted).

Here, Plaintiff asserts that, in formulating his RFC, the ALJ failed to account for three credibly established limitations in his medical history, including his: (1) mental functioning limitations, (2) audiological limitations, and (3) cervical degenerative disc disease.  I will address each in turn.

22

### i. The ALJ did not err in failing to include Plaintiff's mild mental limitations in his RFC

Plaintiff argues that because an RFC finding "must include" all limitations supported by record evidence, regardless of whether the limitation stems from a severe or non-severe impairment, the ALJ's failure to include Plaintiff's mild mental functioning limitations in his RFC requires remand.  In that connection, Plaintiff contends that this failure was not harmless, since his past work as an attorney is skilled work requiring high levels of mental and cognitive functioning, and thus, the ALJ's failure to include any limitations is manifest error.  Defendant disagrees, arguing, first, that there is no rule or regulation requiring all limitations be included, and that an ALJ is free to exclude limitations found at step two that have only a negligible effect on claimant's functioning.  Second, Defendant maintains that after thoroughly analyzing the record, the ALJ properly excluded Plaintiff's mild limitations from the record as negligible.  I agree with Defendant.

As an initial matter, Plaintiff is incorrect that the ALJ "*must* include all of the limitations the ALJ has found to be supported by the evidence of record, whether from severe or non-severe impairments." Pl. Br. at 4 (emphasis added).  Rather, Social Security law merely requires the ALJ to "*consider* the limiting effects of all your impairment(s), even those that are not severe, in determining your [RFC]."   20 CFR § 404.1545(e) (emphasis added).  After considering the limiting effects of the claimant's severe and non-severe impairments, the ALJ "need only include . . . those limitations [in the RFC] which he finds credible." *Salles*, 229 Fed. App'x 140, 147 (3d Cir. 2007) (alteration in original).  "Accordingly, in establishing a claimant's RFC, the ALJ must determine which of a claimant's alleged limitations are credible, and when an ALJ finds that some alleged limitations are less than credible, he or she may properly exclude such limitations from the RFC." *Denise A. v. Comm'r of Soc. Sec.*, No. 20-15616, 2022 WL 2093162, at *7 (D.N.J. June

10, 2022) (citing *Salles*, 229 Fed. App'x at 148 ("A lack of evidentiary support in the medical record is a legitimate reason for excluding claimed limitations from the RFC.")).   Notably, "[w]here the ALJ concludes that a claimant's deficiency is 'so minimal or negligible that . . . it would not limit her ability' to perform required work tasks, the ALJ may exclude that deficiency or limitation from the RFC without error."  *Makowski v. Comm'r of Soc. Sec.*, No. 16-1656, 2017 WL 3151243, at *7 (D.N.J. July 24, 2017) (quoting *Ramirez v. Barnhart*, 372 F.3d 546, 555 (3d Cir. 2004)).

Here, the ALJ thoroughly considered Plaintiff's mental health record, and reasonably found that Plaintiff's mild impairments did not limit his functional capacity.  Throughout the opinion, the ALJ specifically discusses where the evidence supported that Plaintiff did not have mental functioning limitations, or where evidence was inconclusive or lacking.  First, at step two, the ALJ stated that Plaintiff's "medically determinable mental impairments of anxiety, depression, ADD and neurocognitive disorder, considered singly and in combination, did not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and were therefore non-severe."  (A.R. 20.)  In so finding, the ALJ determined that Plaintiff had mild limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself.[2]  (A.R. 20-21.) The ALJ's determinations were based on several tests and treatment notes indicating that Plaintiff had negligible mental limitations.  For example, although Plaintiff reported memory difficulties, the ALJ noted Plaintiff was able to follow instructions, was oriented to person, place, and date,

---

[2] Regarding these step two findings, the ALJ took care to note that the "limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment," but rather, a specific analysis used "to rate the severity of mental impairments at steps 2 and 3."  (A.R. 21.)  In that connection, the ALJ noted that the RFC assessment "used at steps 4 and 5 for the sequential evaluation process requires a more detailed assessment."  (*Id.*)

knew who the current president and first president were, was able to recall 3/3 words immediately and 2/3 after several minutes, knew what he had for dinner the previous night, was able to repeat a sentence and answer comprehension questions, and spell "world" forward and backwards. (A.R. 20.)  In addition, while Plaintiff reported difficulty with concentration, and had difficulty with the serial 7's, needing to use his fingers to count out loud, he got 6/6 correct. (A.R. 21.)

Delving into the mental health record at step four, the ALJ noted that although Plaintiff is prescribed psychotropic medications and had reported past treatment with a psychiatrist, the record did not reflect treatment with any mental health professional since the alleged onset date. (A.R. 28.)[3]  Moreover, the ALJ pointed out that Plaintiff had neither been hospitalized nor had any episodes of decompensation since the alleged onset date. (A.R. 28.)  Furthermore, despite Plaintiff's complaints of mental functioning limitations, the ALJ found "no indication in the claimant's treatment records of significant cognitive or behavioral deficits." (*Id.*)  Indeed, "to the contrary, [Plaintiff's] consultative mental status examination revealed behavior generally within normal limits" and recent "treatment notes reflect no reports of depression." (*Id.*)  Considering this evidence, and that Plaintiff's symptoms were "generally controlled with medication," the ALJ determined that Plaintiff's symptoms were no more than mild in severity. (*Id.*)

Furthermore, the ALJ properly considered the relevant mental medical opinions, which either supported the ALJ's findings or were inconclusive as to the effect of Plaintiff's mental limitations on his functional abilities.  First, the ALJ determined that the state agency consultant's opinions were persuasive. (A.R. 29, 63-83, 85-104.)  Notably, at both the initial level and on

---

[3] In a footnote, the ALJ explained that there were eight pages of treatment notes from 2018 purportedly reflecting Plaintiff's visits with psychiatrist, Dr. Steven Budoff, but the notes were illegible, thus making it impossible to determine what type of treatment Plaintiff received. (A.R 28, 814-21.)

reconsideration, the state agency medical consultants determined that Plaintiff had only mild limitations in mental functioning and that, based on the record, Plaintiff was capable of returning to his past relevant work as an attorney.  (*Id*.)  Next, the ALJ found Dr. Farnese's medical evaluation only somewhat persuasive, because although Dr. Farnese's findings and diagnosis were consistent with Plaintiff's medical record, her "opinions as to [Plaintiff's] mental functioning are conclusory, offering no discussion as to [Plaintiff's] abilities to perform specific job tasks."  (A.R. 29.)  In light of this evidence, and in considering whether Plaintiff could return to his past work, the ALJ stated that "[a]lthough [Plaintiff] alleges mental impairments affect his ability to work, as noted above, his mental impairments are not severe."  (A.R. 30.)

In sum, the ALJ's decision not to include mental limitations in the RFC was based on substantial evidence. The ALJ considered the record, noted where the record was either inconclusive or missing key elements of a person with more severe functional cognitive disabilities, and properly determined that although Plaintiff had mild limitations at step two, the conclusive portions of the medical record did not establish that Plaintiff's non-severe mental impairments required functional limitations.  Notably, Plaintiff does not point to any evidence the ALJ failed to consider which may have changed the ALJ's decision.  As such, the ALJ's decision was based on substantial evidence on the record.

### ii. The ALJ's decision to include only certain audiological limitations was based on substantial evidence.

Next, Plaintiff argues that because the ALJ found Ms. Patel's audiological opinion[4] persuasive, the "ALJ was required," as a matter of Social Security law, "to include all the

---

[4] Under 20 CFR § 404.1502(a)(6), a "[l]icensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders" is considered an "acceptable medical source" for providing medical opinions.

limitations from Ms. Patel's medical opinion in her RFC." Pl. Br. at 14. Specifically, Plaintiff points out that his RFC only limits his ability work in high ambient noise areas, but fails to account Plaintiff's need for conversation to be face-to-face and at close distances, which are separate limitations found by Ms. Patel. Plaintiff contends that the ALJ failed to explain why she omitted this additional limitation.

As an initial matter, Plaintiff mischaracterizes the record and, once again, the duty of the ALJ at step four. Regarding the record, Plaintiff correctly states Ms. Patel concluded that Plaintiff would have difficulty understanding speech, particularly unvoiced consonants, but then in an effort to make Ms. Patel's suggested limitations appear more extreme, Plaintiff states that the opinion "indicated" that Plaintiff "*could only* effectively communicate with another person while facing the individual, within close proximity, and with minimal background noise." Pl. Br. at 14 (emphasis added). But Ms. Patel's opinion does not go so far such that Plaintiff can *only* communicate if these environmental factors are in place. Her medical opinion explains that his difficulty understanding speech "*will be greater* in background noise, when the speaker is at a distance, or when the conversation is not face-to-face." (A.R. 672.) Ms. Patel clearly meant that these environmental factors would make communicating more difficult, but not impossible, as Plaintiff suggests.

As to the ALJ's responsibilities at step four, in a similar fashion to the mental limitation section *supra*, Plaintiff mischaracterizes a particular duty of the ALJ as mandatory. Here, Plaintiff contends that if "the ALJ accepts the opinion of a medical source, she is then required to include the limitations identified by that medical source in the RFC finding." Pl. Br. at 13. Notably, this position is not supported with any legal or statutory citation. Importantly, the Third Circuit's views are contrary to Plaintiff's, by explicitly stating that "[t]he ALJ—not treating or examining

27

physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Indeed, "[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011); *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994) (explaining that "a statement by a plaintiff's treating physician supporting an assertion that [plaintiff] is disabled or unable to work is not dispositive of the issue." (internal quotation marks omitted)).

Here, the ALJ properly considered the record evidence related to hearing loss, including Ms. Patel's opinion, and determined that Plaintiff's hearing loss required a limitation that Plaintiff "cannot work in high ambient noise areas but can otherwise respond to alarms and announcements." (A.R. 22.) In so deciding, the ALJ considered Plaintiff's audiological testing from 2013, which revealed "mild to moderately severe sensorineural hearing loss." (A.R. 23.) The ALJ also noted that that test showed Plaintiff had speech discrimination scores of 88% in the right ear and 96% in the left ear, "indicating good to excellent ability." (*Id*.) The ALJ also considered Plaintiff's subsequent 2018 audiological testing with Ms. Patel, which showed normal hearing sensitivity in the right ear from 250 Hz to 1000 Hz, followed by mild sensorineural hearing loss at 1500 Hz, and moderate to moderately severe loss thereafter. (*Id*.) In the left ear, Plaintiff had normal hearing sensitivity from 250 Hz to 2000 Hz, followed by a moderate to moderately severe sensorineural hearing loss from 3000 Hz to 8000 Hz. (*Id*.) Notably, in word recognition testing, Plaintiff received a 76% in his right ear, which was considered fair, and 88% in his left ear, which was considered good. (A.R. 672.) Ms Patel's opinion further found that Plaintiff needed speech presented at 80 dB HL in his right ear and 70 dB HL in his left ear, and noted that

normal conversational levels are 50 dB.  (*Id*.)  Ms. Patel also pointed out that Plaintiff wears a hearing aid, and has for the past ten ears.  (A.R. 23, 671.)

The ALJ ultimately found Ms. Patel's opinion persuasive, finding that the opinion was consistent with her audiological evaluation and the record in general, which reflected a history of hearing loss and use of a hearing aid.  (A.R. 29.)  In light of the evidence considered, which includes audiological testing and Ms. Patel's opinion, the ALJ determined, consistent with Ms. Patel's suggested limitation, that Plaintiff cannot work in areas of high ambient noise, but that Plaintiff can hear alarms or announcements.  As such, the ALJ's decision was based on substantial evidence.

Furthermore, although Plaintiff argues that remand is required because the ALJ did not include limitations for face-to-face or distance hearing, Plaintiff has failed to show that these omissions were more than harmless error.  Plaintiff "bears the burden to demonstrate harm," as in, "how the error to which he points could have made any difference" in the outcome of his application.  *Holloman v. Comm'r of Soc. Sec.*, 639 Fed. App'x 810, 814 (3d Cir. 2016) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).  First, as noted above, the correct reading of Ms. Patel's opinion recognizes that these two situations worsen Plaintiff's hearing, but Ms. Patel's diagnosis cannot be interpreted to mean that Plaintiff will be unable to communicate or hear in a manner prohibiting work if he is not always face-to-face or close to a speaker.  As such, Plaintiff's failure to argue under the correct reading of Ms. Patel's report undermines his argument that the ALJ committed manifest error.  Second, in attempting to show that the failure to include these limitations was not harmless error, Plaintiff cites the relevant DOT defining that the attorney occupation "requires the ability to talk and hear 'constantly,' for at least two-thirds of the workday."  *See* DOT Code 110.107-010.  The Court examined the DOT Code, and it is unclear

where Plaintiff found such a specific requirement, as the Code does not actually provide that Plaintiff must talk and hear "constantly" for at least "two-thirds" of the workday. *Id*. As such, Plaintiff has not shown that the ALJ's failure to include face-to-face and distance hearing limitations was more than harmless error.

### iii.    The ALJ properly accounted for Plaintiff's cervical degenerative disc disease.

Plaintiff asserts that the ALJ committed manifest error because "[i]t is indisputable that the ALJ included no limitations in her RFC finding to account for [Plaintiff's] severe cervical degenerative disc disease." Pl. Br. at 24. In that connection, Plaintiff notes that this impairment caused neck pain that radiated to other parts of his body, and argues that the ALJ erred in failing to include any postural limitations related to neck or head position, shoulder movement, or manipulative ability. Moreover, Plaintiff asserts that the position of attorney requires a person to frequently reach, handle, and finger, activities which would be difficult for Plaintiff, and thus the ALJ's failure to include proper RFC limitations requires remand.

Plaintiff's complaints are unfounded. First, it is simply untrue that the ALJ did not account for Plaintiff's cervical degenerative disc disease, as the RFC included numerous physical limitations. Although the state agency medical consultants, at both the initial level and on reconsideration, found Plaintiff capable of light work, the ALJ limited Plaintiff to sedentary work. *Chandler*, 667 F.3d at 362 (explaining that "[s]tate agent opinions merit significant consideration" because state agency consultants are disability program experts). Furthermore, consistent with the state agency consultant findings, the ALJ limited Plaintiff to frequently lifting/carrying 10 pounds, standing and/or walking for 2 hours and sitting for 6 hours in an 8-hour workday, occasionally pushing or pulling with his right upper extremity, but never pushing or pulling with his bilateral lower extremities. (A.R. 21-22.) Second, Plaintiff cites to the DOT code for "attorney," and states

30

that "the position of attorney requires the ability to frequently reach, handle, and finger."  Pl. Br. at 23 (citing DOT Code 110.107-010).  But, as has been the case far too many times in his briefing, the relevant citation does not state what Plaintiff claims it does.  Here, the DOT page for "attorney" does not declare that Plaintiff's job requires such a limitation.  As such, Plaintiff's assertion about what limitations should have been included in the RFC is groundless.

Aside from the defects in Plaintiff's argument, in formulating the RFC, the ALJ considered, Plaintiff's cervical degenerative disc disease and the resulting neck pain, as well as Plaintiff's medication regimen, which Plaintiff stated provided significant pain relief and allowed for increased functionality.  (A.R. 24-25.)  After analyzing this evidence, the ALJ specifically stated that the "objective testing confirms severe degenerative change in the cervical and lumbar spine." (A.R. 26.)  However, the ALJ noted, that while "physical examinations reflect some abnormal [] findings, including reduced range of motion, antalgic gait, positive straight leg raise test, and weakness in the upper extremities," other testing was within "normal limits, including no loss of strength or motion in the lower extremities, no sensory deficits, and normal reflexes[,]" and Plaintiff did not use an assistive device for ambulation.  (A.R. 26-27.)  In that connection, despite reports of back pain, the ALJ noted that Plaintiff's treatment had been conservative, consisting primarily of home exercises and medications.  (A.R. 27.)  Plaintiff had previously received multiple epidural steroid injections, but the ALJ pointed out that he had not received any injections between February 2017 and July 2019, indicating that Plaintiff's symptoms had improved.  (*Id*.) Moreover, the ALJ noted that Plaintiff had not undergone more invasive pain relief procedures, nor were there any scheduled surgical interventions.  (*Id*.)

Furthermore, Plaintiff's medical record and activity history were inconsistent with a person requiring the restrictions Plaintiff demands.  The ALJ noted that Plaintiff, by his own admission,

31

did not stop working due to his impairments, but retired on his own. (*Id*.) The ALJ also explained

that the record did not show treatment providers placing any significant restriction on his work

abilities, either before or after his alleged onset date, except for after the 2019 shoulder surgery,

which were temporary restrictions to aid in recovery. (*Id*.) Most notably, Plaintiff's record and

hearing testimony repeatedly indicate that Plaintiff works as a farmer and experiences increased

pain from farm work, which includes collecting, drying, and baling hay. (*Id*.) Plaintiff also

exercises and swims regularly, and Dr. Lei even recommended that Plaintiff continue swimming

and walking for exercise. (*Id*.) Ultimately, the ALJ found that, despite the inconsistencies

between Plaintiff's complaints and this record evidence, objective testing "reveals significant

degenerative changes to Plaintiff's back, knees, and shoulders[.]" and therefore, "[i]n full

consideration of these physical deficits" the ALJ limited the RFC to "sedentary exertional levels,

with significant restriction in [Plaintiff's] postural, manipulative, and environmental limitations."

(A.R. 28.)

　　　In light of this detailed analysis, it is clear Plaintiff merely disagrees with the ALJ's RFC

assessment, and wishes for a different outcome based on the same evidence. But a reviewing court

is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."

*Williams*, 970 F.2d at 1182. As such, I find that Plaintiff's asserted reasons for her physical RFC

limitations were based on evidence that a "reasonable mind might accept as adequate," and

therefore, the ALJ's determination was based on substantial evidence. *Plummer*, 186 F.3d at 427.

## C. The ALJ Did Not Fail to Adequately Develop the Record Regarding Plaintiff's Shoulder Injuries

　　　Plaintiff asserts that because Plaintiff's left shoulder injury and exacerbation of his right

shoulder injury occurred after his date last insured, the ALJ should have further developed the

record regarding these injuries. Plaintiff argues that had the ALJ done so, she would not have

rejected Dr. Pollack's post-surgery evaluation limiting Plaintiff's activities.  In Plaintiff's view, with additional context, the ALJ would have accepted Dr. Pollack's limitations and incorporated them into the RFC.  Separately, Plaintiff argues that the ALJ's RFC failed to accommodate Plaintiff's need for reaching limitations due to Plaintiff's right shoulder impairment.  I disagree.

Although the ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits," *Sims v. Apfel*, 530 U.S. 103, 111 (2000), the claimant bears the ultimate burden of demonstrating an inability to return to the past relevant work.  *Plummer*, 186 F.3d at 428; 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.").  To meet this burden, "Plaintiff must establish disability as of her date last insured."  *Porter v. Comm'r of Soc. Sec.*, No. 18-03744, 2019 WL 2590994, at *4 (D.N.J. June 25, 2019).  In that connection, "[e]vidence of an impairment which reached disabling severity after the date last insured or which was exacerbated after this date, cannot be the basis for the determination of entitlement to a period of disability and disability insurance benefits, even though the impairment itself may have existed before [a] plaintiff's insured status expired."  *Marsella v. Comm'r of Soc. Sec.*, No. 18-2294, 2019 WL 912141, at *10 (D.N.J. Feb. 25, 2019) (quoting *Manzo v. Sullivan*, 784 F. Supp. 1152, 1156 (D.N.J. 1991)).

As an initial matter, Plaintiff's argument that the ALJ failed to develop the record misconstrues Social Security law.  Plaintiff must establish his disability as of his date last insured, which, here, is December 31, 2018.  *See Fleischman v. Comm'r of Soc. Sec.*, No. 12-4869, 2014 WL 809006, at *4 (D.N.J. Feb. 28, 2014) ("If a claimant cannot demonstrate the onset of disability before the date last insured, the claimant is not entitled to benefits."); 20 CFR § 404.131(a) ("To establish a period of disability, you must have disability insured status in the first full month that

you are disabled.").  As such, even though the ALJ has a general duty to develop the record, logically, the ALJ's failure to develop the record as to Plaintiff's later-acquired or worsened impairments occurring after the date last insured cannot be manifest error.  *Alston v. Astrue*, No. 10-839, 2011 WL 4737605, at *3 (W.D. Pa. Oct. 5, 2011) (noting that medical evidence "generated after the date last insured is only relevant to the extent it is reasonably proximate in time or relates back to the period at issue.").  For this reason, although the ALJ did not, for example, request additional expert testimony or order a consultative medical examination, the ALJ did not fail in her duty to develop the record.  Notably, Plaintiff admits that the evidence that he now points to is from after the date last insured, and failed to demonstrate that this later evidence relates back to the relevant period at issue.

Moreover, the ALJ in fact considered the existing evidence before and after the date last insured, and contrary to Plaintiff's position, included additional RFC limitations to compensate for the new injuries.  The ALJ discussed Plaintiff's hearing testimony, where Plaintiff stated that he had pain in his left shoulder, underwent left shoulder reconstruction about a year ago, and was scheduled to have the same surgery in his right shoulder.  (A.R. 22.)  The ALJ also examined Plaintiff's medical records in detail, including those that documented that Plaintiff had right shoulder pain, and imaging in March 2018 of that shoulder revealed marked degenerative change and spurring of his acromioclavicular and glenohumeral joints.  (A.R. 26.)  The ALJ further noted that Plaintiff sustained a left shoulder dislocation in a fall in November 2018, and treatment in January 2019, after the date last insured, indicated the Plaintiff had limited motion in his left shoulder, and that Plaintiff had attempted to doing outside work but his right shoulder, which he had been favoring after his left shoulder dislocation, began to worsen.  (*Id*.)  The ALJ further

discussed Plaintiff's left shoulder MRI in 2019, which showed that Plaintiff had a rotator cuff tear, as well as his subsequent rotator cuff surgery and recovery. (*Id*.)

After considering this medical history, the ALJ found that although Plaintiff's impairments could cause the alleged symptoms, Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence[.]" (*Id*.) Specifically, as it pertains to Plaintiff's shoulder, the ALJ noted that while Plaintiff stated he has right shoulder surgery scheduled, the record did not indicate that such measures had been in fact scheduled. (A.R. 27.) Furthermore, as noted *supra*, the ALJ pointed out that Plaintiff consistently referred to his manual labor as a farmer, and that doctors had not only never placed any significant work restrictions on him, but in fact, had encouraged Plaintiff to continue swimming and walking for exercise. (*Id*.) The ALJ did note that Plaintiff had lifting restrictions placed on him by Dr. Pollack following his shoulder surgery, but also explained that these restrictions were intended to be temporary to aid recovery, and therefore, the opinion was unpersuasive because they did not reflect permanent restrictions. (A.R. 29.) Although Plaintiff asserts that finding Dr. Pollack's opinion unpersuasive was "nothing more than an assumption without any basis in the record," that is not correct. Pl. Br. at 18. The ALJ explained that Dr. Pollack's treatment notes from July 2019, which were later-in-time than the opinion the ALJ deemed unpersuasive, indicated that Plaintiff reported fluctuating pain following surgery, but that he reported "significant" improvement with a steroid injection, and that Plaintiff was only prescribed physical therapy, which included the use of pulleys, and over-the-counter pain medication. (A.R. 26, 935.) The July 2019 treatment notes also stated that prior treatment, including activity modification, ice, medication, and rest, had been helpful in reducing symptoms.

(A.R. 932.)  Notably, the notes indicated that Plaintiff was still participating in some recreational activities.  (*Id*.)

Furthermore, in considering the post-date last insured records, which were generated after the state agency medical consultants review of the record,[5] the ALJ specifically noted that the "updated record, including [Plaintiff's] testimony, suggests that [Plaintiff] is more limited than the state agency medical consultants determined.  In particular, the updated medical record reveal[ed] significant degenerative changes to [Plaintiff's] . . . bilateral shoulders, including [Plaintiff's] recent surgical repair to the left shoulder, [which] support[s] additional limitations in the [RFC]." (A.R. 29.)  In that connection, despite Plaintiff's claim that the ALJ did not account for Plaintiff's impaired right shoulder, the ALJ's RFC specifically limited Plaintiff to only "occasionally push[ing]/pull[ing] with the right upper extremity, and never push[ing]/pull[ing] with the bilateral lower extremities."  (A.R. 21.)

In sum, the ALJ appropriately considered all of the evidence put forth by Plaintiff.  The ALJ's RFC accounted for Plaintiff's shoulder impairments stemming from the period prior to the date last insured, and added additional limitations based on the submitted post-date last insured evidence.  While Plaintiff argues that the ALJ failed to include limitations on his ability to reach, there is no evidentiary basis requiring the ALJ to add such limitations, as the left shoulder surgery and aggravated right shoulder issues occurred following the Plaintiff's date last insured.  Even if Plaintiff argued that because the fall causing his left shoulder injury occurred prior to the date last

---

[5] Plaintiff argues that the state agency consultants' opinions should not be considered relevant because they did not have an opportunity to review the latest shoulder evidence.  Pl. Br. at 17.  I disagree.  The Third Circuit has explained that "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it."  *Chandler*, 667 F.3d at 361.

insured, this would not change the outcome, as the ALJ explained that Plaintiff's symptoms are inconsistent with his pain level, and noted that Plaintiff still performed physical activities, whether it be exercise or farming, and no doctor, besides Plaintiff's surgeon post-surgery, placed functional restrictions on Plaintiff's ability to work.  As such, the ALJ's RFC decision as to Plaintiff's shoulder restrictions was based on substantial evidence.

IV.    **CONCLUSION**

For the reasons set forth above, the ALJ's decision is **AFFIRMED**.  An appropriate Order shall follow.

Date:   6/30/2022                                  /s/ Freda L. Wolfson
                                                   Freda L. Wolfson
                                                   U.S. Chief District Judge